Good morning, Your Honors. May it please the Court. I'm Aluya Imoesli on behalf of Plaintiff Appellant PSM Holding Corp. I'd like to reserve five minutes for rebuttal. This case concerns PSM's efforts to be made whole in restitution after an erroneous judgment was overturned on appeal in the face of defendants' mostly unsuccessful efforts to exploit the District Court's mistakes as an opportunity to unjustly enrich themselves at PSM's expense. PSM respectfully requests that this Court reverse three discreet aspects of the District Court's decisions. First, the District Court misapplied restitution law in refusing to finish unwinding a parental guarantee among the parties. Second, the District Court misinterpreted prejudgment interest law when she retracted her interest award to both parties. And finally, the District Court misapplied attorneys' fees law by entitling the defendants' prevailing party attorneys' fees for their largely unsuccessful post-appeal litigation and effectively for their attorneys' fees in these instant appeals and for any proceedings on remand. This Court has an opportunity, really a responsibility, to correct these mistakes and to effect complete restitution among the parties and to provide much-needed guidance on the novel issues raised in these appeals that really haven't been addressed in much detail since the Stockton Theater's case from the 1950s. Unless the panel prefers a particular order on these issues... Start with the first one. The quota share unwinding. Sure. I'm glad to. So this issue may seem complicated at first glance. Indeed, reinsurance can be a unique technical topic. And the District Court, to her credit, appointed a reinsurance expert to help her understand these issues. But the issues here are quite simple. I'll start with explaining exactly what the quota share agreement is. PSM entered into a parental guarantee where it agreed to pay for all of the losses, 90% of all of the losses, from the beginning of time up until it returned Business Alliance to defendants. And when PSM returned Business Alliance to defendants, PSM did so without getting to keep the collateral for the parental guarantee that it gave. And so what this really is is called a reinsurance agreement where PSM assumes 90% of the losses for losses that come in through the door, for accidents or occurrences that happen, for policies that existed from the beginning of time up until 2011. You think about this as a house. PSM was a family that purchased a house to specifically perform on a contract, paid the purchase price, got the house, and personally guaranteed a mortgage that sat on that house. And made the payments and did so because it was worried that the bank may take negative action if the mortgage wasn't paid or there might be a foreclosure. And after the judgment was overturned, PSM returned the house, but it still stuck with the guarantee without the benefit of having the collateral that is the house or even the equity in the house. Here is the judge's mistake. The judge's mistake is actually quite simple. Because the QSA was not permanent, it could never have qualified to be a capital improvement. And so when the court decided that the quarter share agreement was a capital improvement because it was not a reasonable expense, it missed the predicate. To get to that analysis to figure out who bears the costs, if anyone, you first have to figure out if it's permanent or not. You have to figure out if it's a chimney or a furnace in a house or tiles on a wall that you cannot take out. And because the judge skips that predicate analysis, it made a mistake when it then decided it was a capital improvement. The QSA, all of the evidence, uncontroverted from the judge's reinsurance expert, which aligned 100 percent with PSM's position from the beginning of the case, was that the quarter share could be unwound and it could be unwound very easily. In fact, had already been so. Was there any consideration of whether the agreement initially was based on mistake of fact, in that mutual mistake of fact, in that the assumption was that it was the parent making a deal to preserve its subsidiary and both sides believed that that was going to be the relationship? No, actually it wasn't a mistake of fact. This was actually done when PSM had ownership of the company. After it, it enforced the judgment by taking over the company. And so it controlled the parent and the sub and entered into this parental guarantee to preserve the company that was failing in the economy. It may have been at the time. I suppose I should be asking your opponent this question. But they assumed they were making an agreement between a parent and a subsidiary. That's right. Where, in fact, it turned out it was not a parent and a subsidiary because the subsidiary went back to the other side. So that when they thought they were making a parental subsidiary deal, they weren't. That's an exact, that's a perfect way to think about this. That's right. Was that an issue that was considered by the district judge? The issue was before the court. The issue isn't discussed in the judge's opinion. So we made very clear to the court that this is what we thought we were doing by entering into this parental guarantee. And it was for a sub. And so when we gave back the company and started to unwind the QSA, it was essentially, the mistake is not all of the QSA was unwound. And we made that point to the district court. So the appeal was pending when this QSA was entered into, correct? That's right. So was there any provision for the appeal or any acknowledgment that, well, you know, the appeal might get reversed, you know, we might get reversed. The judge might get reversed on appeal. There was. Maybe we ought to factor that in. There was. And there was in the other agreements that we entered into as well. We made the termination in the agreement very simple to accomplish. And that's why it was very simple to accomplish with just one signature for the future period, from 2011 when we returned the company up until the end. We made it very easy. It could be terminated for any reason at all. And so what you do is you sign one piece of paper, and then that's the end of the agreement ab initio. And now all you have to do is the actual mechanics of giving monies back and forth between the entities. And so we thought about that and were clear to put that kind of language in the agreement to make sure that we could affect. How did that factor into the district courts? District court didn't address it. District court focused her analysis exclusively on whether it was a reasonable expense for which PSM could be entitled to the cost or a capital improvement for which PSM may have to bear the cost without dealing with that first piece. And it was before the court. It was all before the court. And is there any estimate possible as to the value of that? We include an estimate, and an estimate is possible by our rough calculations as of around the time we did our briefing, and it's included in our first opening brief, the blue brief. It's north of $6 million is the cost to us, which is the amounts that we've had to pay out on the contract. If we unwind the contract, when all the monies go back and forth, it ends up being an amount that the defendants have to bear, and it's an amount they would have borne anyway for those policies going backwards. And there is already third-party reinsurance to address those amounts from their perspective. I'd like to, on this point, I just have one small other point to mention. And just so we're clear, in terms of deciding whether this was necessary or not, but I just want to make the point, had PSM not enforced a judgment at all and just allowed the company perhaps to fall, go out of business, in light of what was going on in the economy and so on and so forth, defendants would have no recourse against anyone. And so PSM, when it stepped in, was preserving value for everyone. And now the effect of the district court's error is that PSM is being punished for actually preserving value for everyone here. But what is your solution to that aspect of the case? Our solution and what we're requesting is that this court just reverse the district judge's decision not to unwind the QSA and effect an unwinding, a rescission of the QSA, and that will fix the problem. That is our resolution. That will return the parties to their status quo antipositions, as restitution is supposed to do. It doesn't contemplate payment of any money or anything? No, there will be payment of money. So the payments will go back and forth. And so what will end up happening after we give back whatever reserves that we received and they pay us back for the losses that we've paid, I think it will end up being a payment from the other side to us. When we started doing this, when we'd done the credits and debits, we actually would have had to pay them a sum to completely unwind this. But just as a result of the passage of time and the explosion of losses since this case started and incepted, it has reversed, fortunes have reversed, so to speak. But it's something that would have happened anyway. Quickly, unless the panel has any more questions on this issue, I may want to move down to pre-judgment interest in attorneys really quickly. On pre-judgment interest, the issue here is that the judge in her 2010 order, as well as her 2013 orders, awarded the party's pre-judgment interest on some fixed amounts that they were due, rightfully due, and ordered the parties to go back and calculate it. California law is crystal clear on this point, that pre-judgment interest is available when the amounts are certain. That's, you know, California Civil Code 3287. That's the Evanston case from this circuit. That's Cussler. It's undisputed law. The district court then misapplied the test, partly from an incorrect notion the defendants provided, that it was, the district court wasn't allowed to calculate interest when an accounting had been performed. That was an error, and frankly... I don't think it was that not allowed. She just couldn't do it. No, she said it wasn't allowed. She could do it. The amounts were fixed. They'd always been fixed. They were always certain. There were invoices. There were checks. Some of the numbers never even moved at any point. For instance, the $700,000 number. Is there an order you can show me where she says she couldn't do it without an accounting? I mean, not permitted to do it without an accounting? Is that something like that? Yes, that is in her 2014 order, which I believe is at... ER 81. What page? Or actually, it starts at ER... It's entitled to pre-judgment interest. And then she goes on... Between ER 87 and ER 88, she cites Chesapeake, Muneer, and Sillon, and says the... And this is for the principle that pre-judgment interest isn't available when an accounting has been performed. Where is that? Are you quoting from the quote? I'm citing... I'm pointing you to... What page and line are you on? I'm on ER 87 from the first line, where she's citing Chesapeake and those decisions. From the first line, which states what? Which states everyone is entitled to interest. And then the next sentence, an accounting is prima facie evidence that a claim is uncertain. Nonetheless, California law has not foreclosed the possibility of pre-judgment interest in an accounting action where equity demands such an award. Well, that doesn't say that, you know, I can't calculate it without, you know... I'm not permitted to without an accounting. That's what you said. No, then she keeps going. Well, show me where it says that. 87. Here, the issue of restitution was complex and necessitated the court appoint business valuation or insurance expert. There are numerous discrete questions that the court had to resolve to determine the amount of restitution. For that reason and the authority... I know, but where does it say the law says I cannot compute it without an accounting? That's what you said the law says. No, no. She says... Is there something in here where she says the law prevents me from making a calculation without an accounting? Show me where it is. It's that line. What line? Page and line. What line? ER 87. Line? Where she points to an accounting action... Line what? Line 3 to 4. Line 3 and 4? Yeah, where she says an accounting action is prima facie evidence that a claim is uncertain. All right. So what? And because an accounting action... Wait a minute, wait a minute. That doesn't say I can't make a... The law permits me from making a calculation without an accounting. It just says an accounting is prima facie evidence that a... I mean, so what? That does not say nothing like what you represented says. No, no. And I'm not trying to be... Well, yes, you are. You absolutely are. I apologize, Justice Kagan. This does not say that the law prevents me from making a calculation unless I make an accounting. That's what you said. No, that's actually not what I'm saying. Well, that's what you said. All right. Then move on. If that's not what you're saying, move on. I'll move on. So the point is that each of the amounts at issue here were easy to calculate and they were certain at all times. And the Court's retraction of the prejudgment interest award because the numbers weren't certain was an error. On attorney's fees, just to be clear, PSM has paid all of the defendants' attorney's fees for the litigation, litigating the underlying action to enforce the contract. It's over $2.6 million. And so there was a natural demarcation point back in 2010 once the judge had awarded those fees. The fees at issue here are for what followed, defendants' relatively unsuccessful post-appeal litigation, and ultimately for these appeals and on remand. The mistake here is twofold. The first is that the district court, once she determined that 685.040 fees were not available because the defendant's motion was late, she should have stopped the analysis because that's what Carnes v. Zamani says to do, and that's a decision from this circuit. You no longer, you don't have, you can't go down and start analyzing California Civil Code 1717 fees because you had to have brought your motion under 685.040, which is what defendants did. They were just late. And the Court's decision then to go down and analyze 1717 fees was in error. And then even if the Court could reach 1717 fees, our argument is that 1717 doesn't apply for the reasons that are stated in our papers, namely that these were fresh, really, causes of action for tort-based claims. They weren't successful. There's a double counting of victories. And the judge's decision ignores the fact that this has to be a mutual remedy. And so if PSM itself was successful on those claims, it would be entitled to its fees. But now, instead, we're in a situation where even if we do succeed, the only issue would be defendants' fees and how much we would be required to pay. All right. You have two minutes left. Do you want to save it for rebuttal? I want to reserve that for rebuttal. Thank you. Good morning. May it please the Court. Petter Batalden for the defendants. I'm from Horvitz and Levy. And I'm joined by Nancy Feinman from Kitchett, Petrie and McCarthy. I'd like to begin with an argument that my friend, Mr. Emoisley, did not mention, but which we believe ought to moot the issues of rescission and prejudgment interest entirely.  pending appeal, and then has to return the asset and is obligated to repay and disgorge any profits, can come out ahead as part of that profits analysis. And we are advocating a simple, common-sense rule that when the issue of profits is analyzed, a seizing judgment creditor can never recover an affirmative award. Well, wait a minute, though. That's not necessarily coming out ahead because they want to recover that for the cost they incurred. So they just want to get even, right? Not come out ahead. Your Honor, in situations where a judgment creditor seizes an asset and loses money operating that asset, it's not going to be possible to make all parties whole. There won't be enough money to go around. But that's different from saying if you give him money, he's going to come out ahead. It just means he's not going to come out behind. But, Your Honor, what the district court did by awarding $1.1 million, requiring my clients to pay $1.1 million to PSM for having seized our asset, is to make us come out behind. Well, that's a different argument from the argument you started with, is that they couldn't come out ahead. And they're not coming out ahead if they get the $1.1 million or whatever it is, right? They just want to get even. They would be made whole. That's right. Which is not coming out ahead. Well, it's coming out ahead relative to the judgment debtor, my clients, whose assets have been seized. That means they should never get anything then. No, Your Honor. Even for their expenses. What I would say is this, Your Honor. If an asset that's seized is operated profitably, then there's going to be enough money to make everybody whole, and the judgment debtor can get the overage, can get the excess profits. That would be the fairest solution. But that cannot happen when the asset is not operated profitably. In that instance, there isn't enough money to go around. And as the restatements of restitution explain, the judgment creditor who seized those assets took a risk. They can diminish the profits, maybe even to the point of zero, which is what we think ought to have happened here. Well, that's a different argument than saying they shouldn't come out ahead. Your Honor, our position is that under these restatements of restitution, we're responsible for, or I should say, we can recover any benefit we conferred on PSM, and any award of profits to which we are entitled can be diminished by their expenses. But if their expenses are greater than the revenues, then there was no benefit conferred. We get nothing. That's the end of the story. They never get anything. Don't you get a benefit from the part of the restitution to you that includes the obligation of that company to assume insurance debts due to the deal they made? If I understand Your Honor's question, the answer is no, because that agreement was terminated in 2011 after the company was returned to my clients. But they still have some obligations, though, under the quota system agreement? To the extent there are any ancient losses that are still being paid, they are responsible for 90% of those. But they took in 90% of the premium dollars in order to pay those, so there's already been a fair and equitable treatment there. And the district court recognized that. The district court's decision was that this new reinsurance agreement that was foisted on BAIC by PSM was not a necessity. It was essentially a luxury. There was in place at the time of the seizure a fully adequate reinsurance program. BAIC already had a multifaceted reinsurance program. PSM allowed portions of that to lapse or to cancel it, and then they imposed this new upgraded quota share agreement, this reinsurance agreement. And the district court found, and it's a fact finder entitled to deference on this point, that that was not necessary. It was an improvement. And improvements don't have to be permanent. They don't have to be capital. There were statements of restitution. Didn't we benefit from the improvement? Your Honor, I don't think we did benefit from that improvement, because the quota share agreement was terminated then, as soon as the company changed hands. But the point here is my clients as the judge. What's left of the improvement? How did you benefit from the existence of what was left? During the time period that this reinsurance agreement was in force, it provided the safe harbor, the spread of or dissipation of risk that any reinsurance agreement provides. That agreement was canceled in January 2011, in a letter signed both for PSM and BAIC by people on that side. So that agreement is now over. It hasn't been partly unwound. It shouldn't be any further unwound. One thing I really understood is when the asset went back, when the insurance company went back to you guys, was it a more valuable? Was it in greater value than when PSM took it? No, Your Honor, quite the opposite. What was sort of the status of everything? Well, PSM seized BAIC. They sort of took it apart. They integrated it into their operations. They fired most of the employees. They put a new software program in place. It became a very different entity. And then they turned over the shares to us with an operating system that we couldn't even use to access our own data, and they claimed they lost money while they were operating it. So they seized a profitable company, and they returned an unprofitable one. It was a shadow of itself. It was very unfair. And our point is that legally it's not permissible in this circumstance for PSM, the seizing entity, to obtain an affirmative award in its favor. That's the $1.1 million. We can recover zero if their expenses were greater than their revenues. That's fine. We'll live with that. But they can't come out ahead by getting affirmative relief in their favor. And if you accept that core premise, then the court doesn't need to wrestle with the issues of rescission and prejudgment interest because there's no affirmative relief that they can obtain. There's no California law that says no California case, at least that I was aware of, that says that the district court couldn't do what it did. It was in the role of it was sitting in equity. It was an equitable kind of proceeding. Your Honor is correct that there's no California case that's confronted precisely this scenario. And I think I would say two things about that. First, to the extent that they are the ones defending this award in their favor, I think the lack of case law really cuts against them, not for them. But second, the way we interpret the restatements of restitution shows the way this should occur. You can diminish an award of profits, right? We were the only party entitled to seek profits. We moved for profits. If the expenses were greater than the revenues, you can diminish that to zero. But it makes no sense to diminish that to the point of a negative number where PSM winds up getting paid. That doesn't make any sense. In part of the response to Judge Pius, I think you said again, under the law of restitution, PSM, who's the, who is that? The judgment credit, I guess. Correct. Is not permitted to come out ahead, right? That's sort of a, I guess, you see it as a principle of restitution. What's the best case that supports that principle? Can you cite a case? Or what's the best authority? The best authority are the two restatements, the first and the third. Is what? The two restatements of restitution. Just the restatement itself? Yes. They say, and the district court adopted the analysis from Section 74 of the first restatement of restitution. All parties have agreed on that analysis. There's no dispute about that legal rule applying here. I'm sorry. No, go ahead. Go ahead. What I wanted to add is that the Stockton Theaters case from, which is, I think, the leading case in California from 1952, is also very helpful. Because what that says is you don't just run an accounting and whoever comes out ahead is better. The focus is on making the judgment debtors, that's us, whole. We quoted a key sentence on page six of our gray reply brief, but I want to just read that one sentence, if I may. The fundamental purpose of the court in responding to the demand for restitution was to do equal and exact justice, insofar as that could be done, to the corporation which by judicial error had been deprived of its property. That's us. So the fundamental purpose of this is to make sure that justice is done to us. $700,000 in the list of factors to constitute the million won. There's one for $700,000. I'm sorry, Your Honor. I didn't hear the question. There's a list of amounts that comprise, constitute the $1.1 million you're supposed to pay the other side. Yes. The largest part of that is $700,000. I guess that's one way of looking at it. There were a lot of large sums that were netted out to the 1.1, but there was a receivable, a $700,000 receivable, if that's what Your Honor is referring to. And what is that? Well, a receivable is an asset. It's not a loan. PSM claims to have assumed that loan when they acquired BAIC, but there really isn't evidence of that. What happened was BAIC loaned money to National Farm, the $700,000, so that National Union could prosecute the appeal to this court, in which they won and obtained a reversal of the judgment, and to cover other expenses. And PSM took the position that when they took over BAIC, they assumed that $700,000 asset, even though the books don't reflect that. And, of course, that's another problem here, is that you have PSM reporting to the California Department of Insurance that BAIC is making money. They reported to the state authorities that BAIC was being operated profitably. And then when it comes time for the accounting and the restitution process, they change their tune, and suddenly BAIC is losing money, and they should be compensated and made whole for the losses they suffered. And that creates a terrible incentive structure, because it means a seizing judgment creditor can take risky, aggressive behaviors in operating the assets that have been seized, secure in the knowledge that they'll just be made whole and their losses will be paid for in the event they have to give the company back. That's a dreadful incentive to impose. And that's why, as we say, it may be, if an asset is not operated profitably, that there can be no award of profits to judgment debtors. But it doesn't follow from that that the judgment creditor gets an award in its favor. That cannot be. Now, I wanted to respond briefly to a number of the points that my friend made about reinsurance in case the court gets to those issues. There's no issue of mutual mistake or parent-subsidiary confusion here. The only question is whether this agreement that was entered into ought to be rescinded. And you don't get to rescind contracts willy-nilly. There has to be a good reason. California even has a statute that we've cited in our alternate ground for affirmance. You want to put the parties back in the same position they were before they took over this company? Well, that's not a basis for rescission under the California statute, Your Honor. No, no, but I mean that's just what's in play here, right? No, Your Honor. When contracts are formed, they're inviolate unless there's a breach or there's a ground for rescinding them like mutual mistake. Which contract are we talking about now? The QSA. The QSA, the reinsurance agreement. Yeah. As we explained in our brief, California has enumerated the grounds when rescission is permissible. But this whole proceeding was one of equity, though. I mean, so why couldn't the court unwind it? It's a matter of equity. Well, Your Honor, it would only reach the point of unwinding the reinsurance agreement if it believed that it was a necessary expense rather than an improvement. But why isn't it a mistake of fact, mutual mistake of fact? They thought this is our subsidiary, we're their parent, we're going to enter into a parental child or subsidiary agreement that benefits us both. But as it turns out, this company is not a subsidiary of ours. It belongs to someone else, and we don't intend to subsidize another company. Your Honor, it's not mutual because we never agreed to that. But we weren't a party to the agreement. That's right. They had seized our assets. There's an agreement between what they thought was a subsidiary that they had acquired and them. And your client, who lost his property at that time, had lost the property, of course wasn't the party. But it seemed to me that the QR, whatever the name of that, the PSM entered into an agreement with what it thought was a subsidiary. It was really your property. And both the parties entering into that agreement thought that there was a relationship between them that didn't exist. Your Honor, you heard my friend say earlier there was no mutual mistake and they're not relying on it. They never argue that in the district court. They haven't argued it in any of their appellate briefs. In theory, I suppose, if it had been litigated, maybe they could have come up with some mutual mistake ruling. That issue is not in these appeals. It's not in the case. They have never articulated any basis for rescission other than we have cold feet, we have regrets, we wish we hadn't done this. But that's the whole point. You take the risk. When you're a judgment creditor and you go out and you seize a company, a significant asset, in the midst of a more than colorable appeal, you take the risk. And one of the risks you take is that you may live to regret improvements like quota share agreements and reinsurance agreements. I don't really understand what was unwound and what wasn't with this agreement. Your Honor, nothing was unwound. The agreement was terminated. It had a provision in it that the agreement could be terminated. And at the time when the company was finally returned to my clients, or shortly thereafter, there was a new letter agreement that terminated the quota share agreement. It's done. Nothing has been unwound. They are seeking now to unwind it. What they would like, apparently, is to go back to the district court, where we've been for more than a decade, and spend even more time trying to figure out how to unwind premium dollars that were shared and portions of losses. But they're still on the hook, right, for the old POP premiums? The record doesn't disclose exactly what they think they're on the hook for at this point. But what I can tell you as a matter of basic common-sense insurance law is that whatever losses they may be on the hook for, they've been paid for in premium dollars, right? As an insurer, you pay your losses, you pay claims with the premiums you get. They've kept those $0.90 of every dollar of premiums, and so they're responsible for $0.90 of every dollar of claims they pay. There's nothing unfair about that. I still don't understand what's terminated and what still exists. Your Honor, the quota share agreement was terminated in January 2011. Then why is it you're worried about unwinding? Because what they want to do is to go back and take all of the claims that were paid, all the premiums that were paid in the pre-2011 period. They want to go back and undo all of those transactions, as complicated as that will be. That'll take, I assume, months if not years of further litigation in the district court. And it would, by their own account, apparently, if you believe them, result in another $6 million or $7 million being paid to them, all because our company was seized pending an appeal that we won? I mean, that's sort of the reverse of equity, if you ask me. Let me say a few words about attorney's fees before I rest. We were entitled to the attorney's fees that the district court awarded because we were the prevailing party in an action on a contract. And under California law, that's what you need. There was a statute that was invoked in the district court that doesn't apply. It's a statute whereby you get attorney's fees for enforcing a judgment. We didn't incur fees enforcing a judgment. All of the fees we were paid for were fees for work done before the entry of judgment. And so the Carnes case that my friend has relied on and the statute 685.040, that just doesn't apply. We're in the regular 1717 analysis. We prevailed in an action on a contract. The Anchor Pacifica case that all parties briefed in the district court and to this court is essentially the same scenario. The party goes back and gets attorney's fees for the restitution component of a proceeding before the final judgment is entered. And so we're entitled to those fees. And if you accept our core position that PSM cannot come out with an affirmative award in the restitution or the accounting procedures, then we would ask that you also allow us to recover our full fees, even more than the district court awarded. Unless there are further questions. Thank you. Thank you. If it may please the Court, quickly, Judge Teshima is absolutely right. This isn't a come-out-ahead situation. PSM was getting reimbursed for amounts that hadn't been recouped when the company was returned. And so we're bringing the parties back to square one, so to speak. And Judge Paz is right. There isn't a case in California that does what defendants want you to do here with respect to their bills. And I will venture to say there isn't a case in the land, in the whole U.S., that suggests that their position is correct. Let me correct the record on the QSA. Here is what has been unwound. It's not just premiums that came through the door that PSM received. PSM also had the benefit of controlling something called the policyholder surplus, which is monies that are set aside to the extent that losses exceed the premiums. You can dig into this other fund and fund those losses. Once he gave the company back, the company received, took back the surplus. And so the QSA part that has been unwound is future premiums after 2011 that are written on the company from 2011 to the end of time. What's still in place, and they're still billing us for these losses, are losses from the beginning of time to 2011. That $6 million spread is the extent to which the premiums are too short, and we have no surplus with which to fund the spread. Here, this QSA was to mitigate the company's losses. The company was in free fall at the time. It wasn't designed to profit PSM in any way. It was a parental guarantee. It was a bad business deal, but you do it for a sub if you're a parent. Quickly on the $700,000, it's an amount that defendants loaned to themselves, but as a result of accounting principles, and we explained this very thoroughly in the blue brief, we had to pay it off and give cash to the company and reflect. And there was testimony and evidence on this point, and defendants aren't challenging that amount on this appeal. If your honors don't have any further questions. Thank you, counsel. The case just argued will be submitted. The court will stand in recess for the day.
judges: Reinhardt, Tashima, Paez